1

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
2

    Criminal Action No. 16-cr-0054-WJM-1
3

    UNITED STATES OF AMERICA,
4
    Plaintiff,
5

    vs.
6

    HEATHER CARR,
7
    Defendant.
8
    ------------------------------------------------------------
9
                    REPORTER'S TRANSCRIPT
10                      (Sentencing)

11  ------------------------------------------------------------

12       Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

13  Judge, United States District Court for the District of

14  Colorado, commencing at 2:02 p.m., on the 4th day of

15  January, 2018 in Courtroom A801, United States Courthouse,

16  Denver, Colorado.

17
                        APPEARANCES
18
         MARTHA PALUCH and BRYAN FIELDS, Assistant U.S.
19  Attorney, 1801 California Street, Suite 1600, Denver,
    Colorado 80202, appearing for the plaintiff.
20
         MARY BUTTERTON, Office of the Federal Public Defender,
21  633 Seventeenth Street, Suite 1000, Denver, Colorado 80202,
    appearing for the defendant.
22

23              MARY J. GEORGE, FCRR, CRR, RMR
                901 19th Street, Denver, Colorado 80294
24            Proceedings Reported by Mechanical Stenography
                 Transcription Produced via Computer
25

1            P R O C E E D I N G S

2            (Call to order of the court at 2:02 p.m.)

3            THE COURT:  All right, we're on the record in

4    criminal case No. 16 cr 054, defendant No. 1, United States

5    of America versus Heather Carr.  I'll take appearances of

6    counsel.

7            MS. PALUCH:  Good afternoon, Your Honor, Martha

8    Paluch and Bryan Fields appearing on behalf of the United

9    States.  With us at counsel table is Special Agent Sandra

10   Innis.

11           THE COURT:  Good afternoon to the three of you.

12           MS. BUTTERTON:  Good afternoon, Your Honor.  Mary

13   Butterton on behalf of Heather Carr.  Your Honor, Ms. Carr

14   is on bond and she has joined me at counsel table.

15           THE COURT:  Good afternoon to the two of you.

16           All right.  Will the probation officer please

17   identify himself for the record.

18           PROBATION OFFICER:  Good morning, Your Honor.

19   Matt Gill, U.S. Probation.

20           THE COURT:  Good afternoon, Mr. Gill.  Welcome.

21           All right, Ms. Butterton, will you and your client

22   please approach the lectern.

23           Ms. Hansen, please administer the oath to the

24   defendant.

25           COURTROOM DEPUTY:  Please raise your right hand.

1        (Defendant sworn in)

2        THE COURT:  Record reflects that on the 5th of

3   December of 2016, Ms. Carr entered a plea of guilty to and

4   she was convicted of Count 1 of the indictment, charging

5   conspiracy to defraud the Government with respect to claims

6   in violation of 18 United States Code Section 286.   In

7   addition, at her change of plea hearing the defendant also

8   admitted the forfeiture allegation in the indictment.  We

9   are here for the sentencing of the defendant.

10        Counsel, can you briefly summarize your respective

11   sentencing recommendations.  Ms. Paluch, let's begin with

12   you.

13        MS. PALUCH:  Yes, Your Honor.  At this point, you

14   would just like the number of months that we're seeking?

15        THE COURT:  Just -- well, custody, supervised

16   release, fine, all that good stuff.

17        MS. PALUCH:  Certainly, Your Honor.  The United

18   States is seeking a sentence of 63 months in prison,

19   followed by three years of supervised release, an order of

20   restitution in the amount of $562,000 -- the approximate

21   amount is contained in the pleadings before the Court -- as

22   well as $100 special assessment fee.

23        Given that the defendant pled to the conspiracy

24   count, and the mail fraud counts were dismissed, there will

25   be no request for an order of forfeiture in this case.

1          THE COURT:  All right.  At this hearing, is the

2    Government intending to make any kind of proffer or put on

3    any evidence?

4          MS. PALUCH:  No, Your Honor.

5          THE COURT:  All right.  Thank you.

6          Ms. Butterton.

7          MS. BUTTERTON:  Thank you, Your Honor.

8    According -- consistent with our pleadings previously

9    filed, we are seeking a sentence of 24 months incarceration

10   followed by three years supervised release.  We have no

11   contest with the Government with regard to that, nor the

12   restitution amount which is outlined in the pleadings.

13         THE COURT:  All right.  So the restitution amount

14   has been stipulated to?

15         MS. BUTTERTON:  It was stipulated in the plea

16   agreement, Your Honor.

17         THE COURT:  Yeah.  All right.  Does the defendant

18   intend to make any type of proffer or put on any evidence

19   at the hearing?

20         MS. BUTTERTON:  Outside of Ms. Carr's allocution,

21   no, Your Honor.

22         THE COURT:  Okay.  Thank you.  All right.  I'll

23   turn first to the objections to the presentence report.  I

24   note for the record that no objections to the report were

25   filed by the Government.  The defendant did file objections

1    to the report at ECF 243.  The first objection was to the

2    contents of paragraph 45 of the report which referenced and

3    included in the sentencing recommendation a two-level

4    sentencing enhancement for abuse of position of private

5    trust.

6            Is there any further argument, Ms. Butterton, that

7    you wish to make on this objection?

8            MS. BUTTERTON:  Your Honor, the majority of my

9    argument is outlined in the briefing.  The only thing I

10   will add is in its response, the probation office cited a

11   footnote and I believe that that footnote would be

12   duplicative to another enhancement that Ms. Carr's already

13   receiving --

14           THE COURT:  You are referring to specifically

15   what?

16           MS. BUTTERTON:  The enhancement for use of

17   identity -- I'm sorry, let's go -- it's enhancement in the

18   base offense level.  And I will direct your attention to

19   it; hang on one second.

20           She received, and we stipulated to and agree, to a

21   two-level increase based on the use of a means of

22   identification.  That's 2B1.1b(11)(c)(1) through (2).

23   Again, that's something that has never been in dispute.

24   And I believe that the footnote referred to by probation in

25   their response, that that increase is duplicative with that

1    enhancement, in addition to the other reasons I delineated

2    in my briefing.

3         THE COURT:  All right.  Ms. Paluch, is the

4    Government standing on its response to the objection or do

5    you have any further argument?

6         MS. PALUCH:  I have no further argument.

7         THE COURT:  All right.  In my view there's a

8    decent argument to be made for the application of this

9    enhancement to Ms. Carr and the probation officer has done

10   a good job setting forth the legal basis for doing so in

11   his response to the defendant's objection.  But I am going

12   to sustain the defendant's objection to the two-level

13   enhancement for one important reason:  That being to give

14   Ms. Carr the benefit of the bargain she struck with the

15   Government and agreed to enter her plea of guilty to Count

16   1 of the indictment.

17        A review of the parties' agreement makes it

18   perfectly clear that neither side anticipated the

19   likelihood of the application of this enhancement.  And

20   this is reflected in the position the Government has taken

21   with respect to this objection in that it neither seeks nor

22   advocates for the application of this enhancement.

23        We will of course never know with any certainty

24   whether this defendant would still have entered into her

25   plea agreement had she known that this enhancement was

1    possible, but what we do know for sure is that the parties

2    struck a bargain that did not anticipate the application of

3    this enhancement and that Ms. Carr signed her agreement, at

4    least in part, in reliance on that fact in that agreement.

5         So for these reasons, the defendant's objection to

6    the two-level sentencing enhancement for abuse of position

7    of private trust in paragraph 45 of the report is

8    sustained.

9         All right.  The next objection from the defendant

10   is her objection to the special condition permitting

11   expanded searches or searches without the protection of the

12   Fourth Amendment.  Any further argument, Ms. Butterton?

13        MS. BUTTERTON:  No, Your Honor.

14        THE COURT:  All right.  For the Government?

15        MS. PALUCH:  No, Your Honor.  Thank you.

16        THE COURT:  Okay.  All right.  I'm going to

17   overrule the objection to this special search condition.  I

18   find that such a search condition is warranted under the

19   facts of this case.  Specifically I agree with the

20   Government and the probation officer that this special

21   condition is, in fact, tailored to the facts of this case.

22        Most significant in my view on this point is the

23   fact that the defendant and her co-conspirators carried out

24   the offense conduct using computers located in their

25   residences, and analysis of these computers helped prove

1     the crimes that were charged.

2              Also important and relevant here is the reality of

3     the difficulty in preventing identity theft and I agree

4     with the probation officer that -- and I agree that the

5     probation officer should be provided with the necessary

6     means to ensure that Ms. Carr does not resort to her old

7     ways, and in the future again use other people's identities

8     to commit fraud.

9              So on that basis, the objection to the special

10    search condition is overruled.

11             With respect to the defendant's remaining

12    objections to paragraphs 52, 66, and 68, I find that the

13    subject matter of these objections will not impact the

14    sentence I intend to impose or that I will not consider

15    these matters in sentencing and thus no ruling on these

16    objections is required under Rule 32 and I will make none.

17             All right.  We're done with objections.  Turning

18    to the Government's motions, first is ECF 239, motion from

19    the Government for a third-level decrease in the offense

20    level for acceptance of responsibility.  There being no

21    objection, that motion is granted.

22             Second motion from the Government is the motion to

23    dismiss Counts 1 through 29 and dismiss the forfeiture

24    allegation of the indictment, ECF 238.  Again, there being

25    no objection, the motion is granted.  I should have said

1    Counts 2 through 29, obviously, because we are proceeding

2    on Count 1.  Counts 2 through 29 and the forfeiture

3    allegation of the indictment are dismissed with prejudice

4    as to defendant No. 1, Carr, only.

5            Given my ruling on the Government's motions and

6    the defendant's objections, I find that the total offense

7    level in this case is 25.  The probation officer has

8    determined that the defendant's Criminal History Category

9    is I, which yields an advisory guideline sentencing range

10   of 57 to 71 months, a period of supervised release of one

11   to three years, a fine range of 20,000 to $200,000, and a

12   special assessment of $100.

13           Subject to any objection the parties may have to

14   my rulings on the defendant's objection, do counsel agree

15   the Court has correctly calculated the guideline sentencing

16   range in this case?

17           MS. PALUCH:  Yes, for the Government, Your Honor.

18           MS. BUTTERTON:  Yes, Your Honor.

19           THE COURT:  All right.  Thank you, counsel.

20           All right.  At this time, I'll take up the

21   defendant's motion for a variant sentence, ECF 24.  Ms.

22   Butterton.

23           MS. BUTTERTON:  Thank you, Your Honor.  I would be

24   brief and mainly focus on a reply to the response that the

25   Government has filed.  I would like to note that I

1    appreciate under ECF -- I believe 265, the Government's

2    correction, which I had intended to address today.  So I --

3    I believe the record is more clear about that issue.

4              THE COURT:  What specifically are you talking

5    about?

6              MS. BUTTERTON:  In its initial motion for -- in

7    their initial response to my motion, they had indicated

8    that Ms. Carr cooperated only after her codefendant

9    cooperated.  And that was simply not the order of things

10   and they filed a correction, and I appreciate that.

11             THE COURT:  Okay.

12             MS. BUTTERTON:  In fact, Ms. Carr was the first

13   codefendant to come to the table and cooperate with the

14   Government.  And I believe it's undisputed, although the

15   Government -- I'm not sure what the Government will say

16   about this, that she did -- her cooperation did lead to the

17   indictment of a fourth codefendant in this case.

18             I say that to balance the -- frankly, the elephant

19   in the room.  The majority of my pleadings, as well as the

20   Government's, has been addressing that Ms. Carr did not

21   testify in the trial of her codefendant.  All I can say

22   about that is that should be weighed with her other

23   cooperation.  Cooperation, again, I believe is undisputed

24   that led to a fourth indictment, something that is not so

25   common in cooperation cases.  It is not so common for

1    cooperation to lead to the indictment and, indeed,

2    conviction of someone for whom the Government did not have

3    sufficient evidence to charge when they initially brought

4    this indictment.  So I believe that should be weighed along

5    with Ms. Carr's failure to testify.

6            Now, do I believe that the Government could have

7    done things to ensure that?  I do.  And I've laid those out

8    in my pleadings.  I'm sure the Court's reviewed them --

9            THE COURT:  To ensure her testimony?

10            MS. BUTTERTON:  Correct.

11            THE COURT:  Well, I was going to ask you about

12    that.  How is it that you believe the Government could have

13    subpoenaed your client if she is a resident of Virginia?

14            MS. BUTTERTON:  I believe that -- well -- let me

15    say this:  My subpoena powers are different from the

16    Government's, so their procedure is completely different

17    from mine.  But I can tell you in preparing for an upcoming

18    trial I have, we have requested subpoenas through the court

19    for many people who live outside the state.  So I suppose I

20    don't know the exact answer to that question only that I'm

21    sure that it's possible.

22            THE COURT:  Okay.  I'm glad your --

23            MS. BUTTERTON:  She has --

24            THE COURT:  I'm glad you're sure; I'm not so sure.

25    But moving past that point, what about the Government's

1    point, which I think is the stronger, more significant one

2    here, which is as all litigators know, there's a world of

3    difference between a cooperative testifying witness and a

4    witness that has been subpoenaed against his or her will to

5    come into court and testify involuntarily?  And the latter

6    type of witness, we probably all in this room -- all the

7    lawyers in this room have had experience with such an

8    individual turning on our client, testifying in ways we

9    didn't anticipate, inconsistent with knowledge or evidence

10   that we have prepared prior to trial and otherwise

11   testifying in ways that may require the lawyer calling such

12   an uncooperative witness -- in this case, the Government,

13   in your scenario -- to then have to impeach the

14   Government's own witness because the witness has now

15   provided testimony that's contrary to the testimony the

16   Government believed was going to be coming from the witness

17   who was cooperating and being seated at the witness stand

18   voluntarily?  What about that difference?

19          MS. BUTTERTON:  Your Honor, I have to be a little

20   careful and mindful of my obligations regarding privilege

21   to Ms. Carr, but let me say this:  Any idea that she, or

22   anyone -- I'll just separate it out -- that anyone who is

23   subpoenaed would come in and say something different from

24   the -- that was previously prepared is speculation.  We

25   don't know what Ms. Carr would have said because she didn't

1    testify.  And there's no indication at all that she would

2    have not followed her oath if she was required to do so.

3          She was not required under any law at all to

4    appear in court.  Should she had been subpoenaed --

5          THE COURT:  Other than her -- her agreement with

6    the Government to do so.

7          MS. BUTTERTON:  Certainly.  And she knew the

8    consequences when she made that decision, she was fully

9    informed of those.  But those consequences were not a vow

10   to tell the truth, which she would have done if she sat in

11   that chair.  And I don't believe that the Court should

12   assume that she would have done anything but that.

13         THE COURT:  I'm not making any such assumption.  I

14   was just asking you to respond to the Government's argument

15   of distinguishing between a cooperating witness and a

16   subpoenaed witness.

17         MS. BUTTERTON:  Well, I guess I will make a

18   similar speculation and say if Ms. Carr had been required

19   under the law to appear, I would assume that she would

20   appear as required and testify as -- under oath as her

21   obligations would.

22         I don't think it's fair to assume that she would

23   have been a difficult or adverse witness.

24         THE COURT:  Okay.  Then let's move past that point

25   and I'd like you to address the cases which have -- and I

1    think circuit level cases, that have discussed the fact

2    that what your client did in entering into a plea agreement

3    which precipitated, as just happened a few minutes ago, the

4    dismissal of 28 out of 29 counts and dismissal of a

5    forfeiture allegation in the indictment, and then renege on

6    her agreement to testify, that these cases have held that

7    that is an aggravating factor I can consider under 3553(a)

8    when considering the appropriate sentence to impose.

9         MS. BUTTERTON:  Your Honor, I don't disagree with

10   the cases that it's an aggravating factor.  My point is

11   that it's -- in considering globally her cooperation, that

12   that is out- -- if not outweighed, then equal to weight in

13   the indictment and conviction that she provided to the

14   Government that they would not have gotten without her

15   cooperation.

16        So certainly -- listen, under 3553, the Court can

17   consider all nature and circumstances, her history and

18   characteristics.  And I'm certainly not arguing that the

19   Court can't consider her lack of testimony.  I can't

20   imagine a world where that -- I mean, these are pretty

21   global concepts.

22        THE COURT:  Right.

23        MS. BUTTERTON:  I expect that the Court can and

24   will consider it.  My position is that the Court should

25   also consider her other cooperation that I believe has

1    been -- well, I'm not going to say the Government has

2    downplayed it, because they're not under any obligation to

3    make such a motion before the Court.  We knew that when we

4    signed the plea agreement.  But the Court can consider it.

5              And, again, I don't think the Government's in a

6    position to not -- to deny that Ms. Carr did provide this

7    kind of very substantial cooperation that, again, led to

8    another conviction.  And --

9              THE COURT:  So it's your position -- you're

10   representing to me as an officer of the court that it's

11   your client's cooperation that resulted in the indictment

12   of Ms. Green?

13             MS. BUTTERTON:  I think that the indictment of Ms.

14   Green would not have happened without Ms. Carr.

15             THE COURT:  Okay.

16             MS. BUTTERTON:  Is it solely that?  I certainly

17   can't say that.  I am not a prosecutor and the methods

18   about which they go about their methods --

19             THE COURT:  We'll let the Government correct us if

20   we're wrong in our assumptions and inferences.

21             All right.  I don't want to be heard as thinking

22   that my sentence is going to rise and fall based on this

23   issue of her failure to testify and the breaching of her

24   plea agreement.  Obviously that's just one factor.  There's

25   a whole host of factors that I need to consider when

1   sentencing this defendant today apart from what she did or

2   didn't do in the trial for Mr. Thomas.  So can you address

3   those factors, please.

4   MS. BUTTERTON:  Thank you, Your Honor.  The nature

5   and circumstances of the offense are not in dispute and Ms.

6   Carr has accepted responsibility for those and continues to

7   do so, so I will move past that.

8   Outside of that, Your Honor, Ms. Carr is -- has no

9   criminal history.  She has none.  She -- now, I believe the

10   Government may have misconstrued my speaking about her

11   family, something I typically do in almost every sentencing

12   pleading.  That's not to say that she shouldn't be punished

13   because she has a family.  If that were true, then no --

14   THE COURT:  Then no parent could ever go to

15   jail.

16   MS. BUTTERTON:  And I am certainly not doing that,

17   and it's not my intention.  My point was to show who she is

18   as a person.  This is a woman who came from nothing.  She

19   left home at 14, was on her own, was a runaway.  At 17 was

20   pregnant, has raised that child to be a really

21   extraordinary young woman who's now in pharmacy school,

22   married, and will, in fact, be taking care of Ms. Carr's

23   younger children during the anticipated term of

24   incarceration.

25   She has three additional children, one of whom has

1    special needs.  Again, I don't say that to garner sympathy

2    for that child, I say that so the Court knows a little bit

3    about Ms. Carr and who she is.  I believe in her allocution

4    she's going to speak to some of this, and I spoke to it in

5    my variance motion.  I think the mistakes that she made and

6    the decisions she made were an effort to give her kids a

7    better life than she had and because, frankly, it couldn't

8    get much worse than what she had.

9         Again, this is her first real criminal -- she's --

10   interaction with criminal court, other than a juvenile

11   issue.  And we concede that incarceration is necessary,

12   especially given the number of victims and their vulnerable

13   positions.  But the amount of time that the Government is

14   requesting, over five years, is simply greater than

15   necessary.

16        This is a woman who's not violent, she has

17   maintained every condition of her bond to the T, and has

18   made every effort not only to take responsibility in front

19   of this Court but to make efforts in her life to make sure

20   her family is not so affected.  She just last week moved

21   her family to Arizona so her kids will have some stability

22   while she knows she's going to have to be incarcerated.

23        I will rest on my pleadings for any further

24   argument, Your Honor, and we stand by our request for 24

25   months.

1          THE COURT:  Let me ask you to address something

2     you haven't addressed, which is the seriousness of the

3     offense, which is obviously a factor I have to consider

4     under 3553(a).  Not only in my view did -- was Ms. Carr the

5     key player in this conspiracy, because without her access

6     to the Accurint database of the victim, none of the other

7     three could have done anything, so that's one thing.

8          So even though we didn't -- I didn't -- I agreed

9     with your objection to the enhancement for a betrayal of

10    position of trust, the fact remains that but for her access

11    to inside bank information about the victims, these crimes

12    never would have taken place.

13         Secondly, the amount is significant.  We're

14    talking over half a million dollars that was fraudulently

15    obtained.  And, thirdly, the vulnerability of the victims.

16    You know, we don't usually put vulnerable and incarcerated

17    victims in the same sentence in this courtroom or anywhere,

18    but in this case, they are vulnerable because they have no

19    control over what's being done with their identities.  And

20    I don't know if you took the time to read the victim

21    statements, but I did, and I was struck by the eloquence of

22    some -- of a couple of them who pointed out that

23    reintegrating back into civilian life and lawful society is

24    hard enough for any ex-con, but then to run into the

25    buzzsaw of someone having stolen your identity, there being

1    a hold on your credit history, you can't -- probably is

2    going to be -- if being a felon didn't make it difficult

3    enough to get a job after your imprisonment, if that

4    weren't enough, then on top of that, you have all these

5    credit issues.  And I think it's appropriate for me to take

6    judicial notice of the fact that most employers look at

7    credit histories when they're considering prospective

8    hirees, obtaining loans for any kind of residence they may

9    want to purchase or rent, vehicles, all that.

10              So your client intentionally -- not that any

11   victim of identity theft would be a preferable or good

12   victim, but it was pretty calculated -- the calculated way

13   in which it was determined that here is a slice of society

14   that literally cannot -- can do nothing to stop or report

15   these crimes being committed against them.  And so all of

16   those things are matters that you haven't addressed either

17   in your motion or orally right now and I'd like you to do

18   that.

19              MS. BUTTERTON:  Your Honor, I'll be honest.

20   Outside the court -- and I'm really speaking in my role as

21   a defense attorney -- I'm probably -- outside of the court

22   I'm probably the most familiar with how terrible people who

23   are incarcerated have it; on the inside and especially when

24   they come out.

25              It's something I've spoken extensively with Ms.

1    Carr about because, as I advocate for her and I believe

2    that there are elements of this that are mitigating, but I

3    have strong personal feelings about inmates and the way

4    that they are judged coming out and the difficulties they

5    face.

6          The irony is Ms. Carr is now going to be in the

7    very similar position.  She's going to come out with a

8    felony conviction, her finances are, with all due respect

9    in tatters, and will have a half million dollar judgment

10   hanging over her head.  I think that's a pretty fair and

11   equitable and due punishment.

12         There's no question that she took advantage of

13   vulnerable people.  And is there anything more just that

14   she now becomes one of them?  That's all I can really -- I

15   mean, the nature and circumstances of the offense are what

16   they are.  And I certainly understand why the Court feels

17   strongly about it, or why anyone should feel strongly about

18   it.  But that is all part of the sentence, incarceration

19   and collateral consequences that Ms. Carr is going to have

20   to face, and she's very well aware of that.

21         THE COURT:  Okay.  Anything further you wish to

22   say in support of your motion?

23         MS. BUTTERTON:  No, Your Honor.

24         THE COURT:  All right.  I'll give you an

25   opportunity, as I always do, for movants to have a brief

1    reply after we hear from the Government.

2              MS. BUTTERTON:  Thank you.

3              THE COURT:  All right.  The two of you can sit

4    down.  I'll hear from the Government in opposition to the

5    motion.  Ms. Paluch.

6              MS. PALUCH:  Thank you, Your Honor.  I'd like to

7    begin by addressing what appears to be a representation

8    that Ms. Carr alone is responsible for Marcelle Green being

9    indicted --

10             THE COURT:  I think Ms. Butterton made it clear

11   that she wasn't making that representation.

12             MS. PALUCH:  Right.

13             THE COURT:  But that she was -- that her

14   information -- that her client's information was

15   instrumental in obtaining the probable cause and the

16   indictment against Ms. Green.

17             MS. PALUCH:  And that's fair, Your Honor.  But

18   what's being overlooked is the role that Mercedes Diaz

19   provided as well.  In addition, upon her arrest in the car,

20   Marcelle Green indicated she wanted to cooperate with the

21   Government.  So I don't believe it's fair to say that that

22   indictment were -- or conviction was based entirely -- or

23   the majority of it based on this defendant's cooperation,

24   but what that does highlight is had Ms. Green gone to trial

25   and this defendant not testified, it would have made it

1    even worse.

2            If she's claiming that she's responsible in part

3    for that defendant, the information she provided, and then

4    she doesn't testify against Green, had that happened, it

5    would have made her pulling out of this case even worse,

6    and I think that's a factor for the Court that's fair to be

7    considered.

8            As to a subpoena not being issued in this case,

9    Ms. Butterton on one hand says that the Court shouldn't

10   speculate that Ms. Carr would have taken the stand and not

11   testified consistent with her prior statements.  What she's

12   saying is that we were supposed to assume the risk and that

13   we were supposed to speculate that Ms. Carr would take the

14   stand and testify consistent.

15           You know, this is at the last minute and she's

16   saying, I will not testify.  And we're supposed to assume

17   that if we had her under a subpoena, she then would have

18   taken the stand?

19           One of the cases the Court referenced that's cited

20   in our response, it's the *Turner* opinion, and it's out of

21   the Seventh Circuit.  And in that situation, there, too,

22   the defendant claimed, well, the Court wasn't ordering that

23   defendant to take the stand.  And what the circuit court

24   here held is that all cooperation means is testifying when

25   there is no legal obligation to do so.

1             That was the cooperation agreement in this case.

2    She was to come to court and cooperate and testify without

3    us being required to send out FBI agents in Virginia to

4    find her and put her under subpoena.  We had been in

5    constant contact with this defendant leading right up until

6    the day of trial.

7             THE COURT:  When did you first learn that the

8    defendant had decided not to testify in Mr. Thomas' trial?

9             MS. PALUCH:  When we returned to our office after

10   the first day of testimony.

11            THE COURT:  So Monday evening.

12            MS. PALUCH:  Correct.  She did fly to Denver; she

13   was in Denver.  We even looked into the hotel that we had

14   paid for for her to stay and she did not check into that

15   hotel.

16            THE COURT:  Okay.  And before -- just so I'm

17   totally clear in my mind, prior to that moment you had

18   every expectation that she was going to fulfill her

19   obligations under the cooperation agreement and testify?

20            MS. PALUCH:  Absolutely.

21            THE COURT:  You had not -- you had not received

22   any communications from Ms. Butterton or had any reason to

23   believe otherwise?

24            MS. PALUCH:  No, none whatsoever.  And that is the

25   only reason that the opening statement that was given in

1     this case outlining the testimony we expected from this

2     witness would be presented and then we were forced in

3     closing to tell the jury that even though we promised you

4     all of this evidence, you would not hear from Ms. Carr.

5          The Court asked defense counsel about the nature

6     and circumstances of the offense and the Court's very well

7     aware of those and we've set forth our arguments in

8     opposition to the variance in our pleading, but there are a

9     few points that I would like to point out in addition to

10    those already made.

11         And as to the nature and circumstances of this

12    offense, what I'd like the Court -- for me to focus on is

13    the fact that this defendant had choices.  She chose to

14    participate in the scheme for over two years.  26 months is

15    the duration of the scheme as set forth in the indictment.

16    And during that time, she chose over and over and over

17    again to steal the identity of these inmates.  181 inmates'

18    identity stolen in 26 months, and that comes out to

19    approximately seven identities stolen each month.  Seven in

20    each of the 26 months.  Every single identity stolen by

21    this defendant, not by her codefendants.

22         Any possible argument -- and I don't believe she's

23    making this -- but that Trammel Thomas was responsible for

24    her involvement, he was in prison for 10 months; he was in

25    jail for 10 months.  During those 10 months, and in

1    addition, during the 26 months at any point this defendant

2    could have said, I'm not going to do this any more.  I'm

3    not going to go online and pull off somebody's identity.

4    I'm not going to fill out the paperwork and submit it to

5    the schools.  I'm not going to keep doing all this homework

6    when I have a full-time job and I'm raising four children.

7    I'm not going to keep completing these homework assignments

8    in order to get the federal student aid.

9         She didn't do that.  She could have stopped after

10   Thomas was arrested with the debit cards; she didn't.  She

11   could have stopped after her home was searched by law

12   enforcement; she didn't.

13        THE COURT:  When was -- when was the search in

14   relation to the end date of the conspiracy as charged in

15   the indictment?

16        MS. PALUCH:  That's a good point, Your Honor.  The

17   end date in the conspiracy is in October.  The --

18        THE COURT:  Of?

19        MS. PALUCH:  Of 2012.  The search occurred in

20   November.  But the testimony from Ms. Green was they had

21   debit cards that were still in the works, that they still

22   continued with the scheme after the search.

23        THE COURT:  Okay.

24        MS. PALUCH:  You know, this is not a defendant who

25   made one bad mistake and was repentant and felt bad about

1     it.  Instead, she made 181 bad mistakes over a period of 26

2     months.  And as to her argument that she has virtually no

3     criminal history, I think that's undercut by the duration

4     that she continued over and over to engage in this fraud.

5          Now, as to the deterrence factor set forth in

6     3553(a), a significant sentence in this case, Your Honor,

7     we believe is submitted -- it's warranted not only to

8     address this defendant's conduct, but also to address and

9     to deter other defendants who may entertain such similar

10    types of schemes, in addition to address this defendant's

11    pulling out of a cooperation agreement at the last moment.

12         What this defendant did is well-known to the

13    federal defense bar, it's well-known to our office.  And

14    when --

15         THE COURT:  How do you know that?  How do you know

16    that?

17         MS. PALUCH:  I know that just through speaking to

18    the prosecutors in our office who have talked to members of

19    the defense bar; I know that from defense bar members

20    talking to me about it.

21         THE COURT:  Okay.

22         MS. PALUCH:  When the next defendant decides to

23    pull out of a cooperation agreement, defense and Government

24    counsel can point to the sentence given in this case and as

25    an example of what happens when someone reneges on a

1    cooperation agreement at the very last possible moment.

2           Another consideration for the Court is if the

3    Court were to impose the 24-month sentence here, which is

4    approximately a 60-percent reduction from the range as

5    calculated, that sentence will set the stage for the

6    remaining defendants to be sentenced in this case and we

7    will be working off that sentence for all of the other

8    defendants to be sentenced here in order to avoid

9    unwarranted sentencing disparities.

10          Now, in sum, when the Court considers the vital

11   role played by this defendant, the intended loss of 1.3

12   million, the actual loss of over $562,000, the harm caused

13   to the vulnerable victims, to the Department of Education,

14   to the community colleges, and to the justice system

15   through her failure to comply with the terms, for all of

16   those reasons we submit a sentence of 63 months in prison

17   is a just and sufficient one, Your Honor.

18          For those -- thank you for your time.

19          THE COURT:  All right.  Let me ask you a question.

20   Now I didn't see in your response, or any submission, any

21   information to provide me a framework of how these cases

22   have been sentenced by other courts previously in the

23   country, or is this the very first FAFSA fraud case that

24   DOJ has ever prosecuted?

25          MS. PALUCH:  It is not the first, Your Honor.  And

1    that is a good point.  I do not have that information for

2    you.

3              THE COURT:  All right.  So you've not researched

4    it?

5              MS. PALUCH:  I have not.

6              THE COURT:  Okay.  What about the other points

7    that were made in the motion in terms of the defendant's

8    history and characteristics and those matters?  Do you want

9    to address that at all or --

10             MS. PALUCH:  No, I think it's -- I think Ms.

11   Butterton explained very well that she's not pointing those

12   out as a basis for the variance but, rather, to just

13   explain the individual that Ms. Carr is and I think that's

14   entirely appropriate.

15             I think when you look at the case law and the case

16   law that we've cited in our response as to hardship to

17   family and all those things, I don't think there's anything

18   in the variance motion filed by the defense that warrants a

19   reduction all the way down to 24 months.

20             So absolutely the Court needs to consider all of

21   those factors, but I don't think in combination they

22   warrant such a significant variance.

23             THE COURT:  All right.  Thank you.

24             MS. PALUCH:  Thank you.

25             THE COURT:  All right.  Ms. Butterton, it's your

1    motion, I'll give you an opportunity for a brief reply.

2            MS. BUTTERTON:  May I have just one moment, Your

3    Honor?

4            THE COURT:  You may.

5            MS. BUTTERTON:  Thank you.  Your Honor, at this

6    moment I'm going to rest.  Thank you.

7            THE COURT:  Okay.  You can both stay there for the

8    time being.

9            All right.  Before I rule on the motion, I'm going

10   to consider some of the Section 3553(a) sentencing factors

11   as they apply to this defendant.  The record in this case

12   indicates that Ms. Carr is 40 years old.  She is a citizen

13   of the United States.  The defendant was born in Virginia.

14   After her parents divorced her mother remarried and Ms.

15   Carr claims she was subjected to serious abuse on the part

16   of her stepfather while she was growing up.

17           She moved with her mother and stepfather in 1983

18   from Virginia to Colorado Springs.  In 2003 she relocated

19   to Phoenix, Arizona, with her boyfriend at the time.  She

20   has had little to no contact over the past 30 years with

21   her parents or her sister, Shannon Haddox.  Ms. Carr left

22   East Junior High School in Colorado Springs in the seventh

23   grade and did not return to school.  She has a GED that she

24   earned in 1995.  And she's also earned 67 credits towards a

25   business administration associates degree at Maricopa

1    Community College in Phoenix.

2            The defendant has never been married and she's not

3    currently involved in any committed relationship.  Her last

4    relationship was with codefendant, Trammel Thomas, whom she

5    dated from 2009 to 2014.  She has two children with Mr.

6    Thomas, Miland Thomas, age 7; and Tru Thomas, age 3.

7            From a prior relationship with one Omar Jones, the

8    defendant also has two older daughters, Ayana Brown, age

9    22; and Kaira Jones, age 17.  According to the defendant,

10   she and -- she enjoys an excellent relationship with all of

11   her children, and has informed the probation officer that

12   all four of them are aware of her guilty plea in this case.

13           Ms. Carr currently has custody of her three minor

14   children.  Her oldest daughter, Ayana Brown has indicated

15   that she and her husband, Demarcus Brown, wish to take

16   custody of their three full and half siblings when Ms. Carr

17   is incarcerated.

18           Presently also living with the family is an

19   individual by the name of Aubrey Richardson, age 22, whom

20   the defendant claims she adopted when Ms. Richardson was

21   14.  Probation officer has been unable to verify that this

22   legal relationship exists between these two women.

23   According to the defendant, Ms. Richardson helps to take

24   care of the younger children.

25           With regard to gainful employment, Ms. Carr was

1    working as an underwriter in Wells Fargo Auto Finance in

2    Phoenix in 2009 until she was terminated in the instant

3    offense in 2015.  Prior to that she worked as an

4    underwriter of the mortgages division of that same bank,

5    also in Phoenix.  Prior to 2003, the defendant worked as a

6    credit manager for auto loans.

7            Since being on bond on this case, she has worked

8    for a driver of both Uber and Lyft and she has run a custom

9    digital hard service.

10           Regarding to the defendant's criminal history

11   according to the presentence report, she has one juvenile

12   criminal adjudication and has been assessed zero criminal

13   history points by the probation officer and she is before

14   me on her first felony conviction.

15           Turning to the nature and circumstances of the

16   offense, given the voluminous details of the defrauding of

17   the Government perpetrated by the defendant, I incorporate

18   herein by reference the excellent summary of Ms. Carr's

19   criminal activity by the probation officer found at

20   paragraphs 8 through 15 of the report.

21           I will therefore recite right now for the record a

22   substantially abbreviated summary of this stipulated facts

23   in this case.  Ms. Carr's offense conduct stems over 26

24   months and involved the defendant, as well as her

25   codefendants, conspiring to defraud the Department of

1    Education by submitting false claims for federal student

2    aid.

3            This defendant and/or her codefendant, Trammel

4    Thomas, obtained names, birth dates, and Social Security

5    numbers for a large number of incarcerated individuals --

6    181 to be exact -- and used their personal information to

7    apply for federal student aid.

8            In these circumstances, these inmates are

9    currently -- are correctly considered by the guidelines to

10   be vulnerable victims.  While the defendant and Mr. Thomas

11   devised the scheme, codefendant, Mercedes Diaz, agreed to

12   receive mail in the names of the inmates at her residence

13   and mailbox address she rented in the names of other

14   individuals.

15           During the course of the conspiracy, the defendant

16   and her codefendants were involved in submitting over 150

17   FAFSA applications, seeking approximately $1.3 million in

18   federal financial aid funds.  The Department of Education

19   disbursed over 560,000 as a result of Ms. Carr's and her

20   codefendants' false claims.  Of that amount, the defendants

21   received over $420,000 in refunds.

22           As of today, the defendant has served one day in

23   pretrial detention.

24           Mr. Gill, do you wish to make any statement at

25   this time on behalf of the probation office?

1          PROBATION OFFICER:  No, sir, Your Honor.

2          THE COURT:  All right.  Thank you.  All right, Ms.

3     Butterton -- actually before you get back up there, Ms.

4     Paluch, are there any victims in the courtroom that wish to

5     address the Court?

6          MS. PALUCH:  No, Your Honor.

7          THE COURT:  All right.  Thank you.  Now Ms.

8     Butterton, you and your client can go back to the lectern.

9          Ms. Carr, do you wish to make any statement to the

10    Court on your own behalf before I announce your sentence?

11         THE DEFENDANT:  Yes, sir.  I've been waiting a

12    long time to talk to you.

13         THE COURT:  Here's your opportunity.

14         THE DEFENDANT:  Okay.  So I gave my statement in

15    November of 2016.  I had one interview with Beth Gibson,

16    Ms. Paluch, and Sandra.  And as -- I didn't hear from them

17    at all for a year.  I gave my plea and then the month of

18    trial -- Mr. Thomas' trial, I was contacted to prep for

19    trial.

20         The first phone call -- we had a total of four

21    phone calls over the phone to do this prep.  The first

22    phone call --

23         THE COURT:  "We," is who?

24         THE DEFENDANT:  Everybody here on the first phone

25    call.  Everybody on --

1           THE COURT:  At the counsel table.  Okay.

2           THE DEFENDANT:  Yes, sir.  It was pretty much a

3    disaster because I've never -- my extent courtroom

4    experience is Law & Order.  Like I don't know how to answer

5    questions, like they were trying to prep me.  I was like

6    overexplaining everything.  They were getting really mad at

7    me.  You know, kind of saying that, Well, we can't lead you

8    to this, you have to say this.

9           And it was pretty much a disaster.  So they set up

10   a following phone call the following Monday.  That phone

11   call was a super disaster because Mr. Fields started

12   yelling at me -- okay, but let me -- let me lead up to

13   this.

14          First they asked me if Mr. Thomas had ever filled

15   out a FAFSA and I said to my knowledge, No, I had never

16   seen him fill out a FAFSA.  He started getting mad and then

17   was like, Well, if this is the way you're going to answer

18   questions you're in for a lot of trouble.

19          THE COURT:  Okay.  Ms. Carr, let me step in here.

20   Your allocution is an opportunity -- you have the -- and

21   your right to speak to me, giving me your opportunity to

22   tell me who you are and why you did what you did and give

23   me a window into, from your perspective, the criminal

24   activity that you engaged in.

25          It's really going to be very unhelpful and of

1    little use for you to go into discussions you had with the

2    Government's attorneys prior to trial because that's not

3    what you were indicted for.  All right?  What I'm

4    interested in is your discussion and explanation and your

5    opportunity to show me remorse and acceptance of

6    responsibility for your crimes.  Okay?

7            Your phone calls with the Government are -- is not

8    what's going to drive your sentence.

9            THE DEFENDANT:  Okay.

10           THE COURT:  So --

11           THE DEFENDANT:  He just told me he was --

12           THE COURT:  Hold on.  If this is all a lead-up to

13   an explanation of why you didn't testify, just give me

14   that, you know, in a 30-second summary.  Don't go into how

15   you were abused on the phone call by the prosecutors, which

16   I have now seen Mr. Fields on at least a couple of trials,

17   Ms. Paluch on one.  I find it hard to believe that they

18   would be abusive on the phone to you, but go ahead and give

19   me your version.

20           THE DEFENDANT:  Okay.  He started yelling at me.

21   He told me he was going to rip up my deal and send me to

22   prison for a very long time, to which my lawyer had to

23   terminate the phone call and hang up on them, and did not

24   call them back until the following Monday.  The following

25   Monday, they promised me I would never have any contact

1    with Mr. Fields.  They apologized for his actions.  They

2    said he's usually very mild-mannered.  They had no idea

3    where the outburst came from.  And they said I would never

4    have any further contact with him.  That phone call went

5    well.

6         And then our last phone call the week of -- and I

7    tried to give them more information and they never sent

8    over an MOI.  They didn't want to hear the information.  So

9    I was scared that if I got on the stand, they were refusing

10   information that I knew I was going to be cross-examined on

11   and I would be like perjured or something.  And she was

12   like, Nope, nope, I don't want to hear it.  I don't want to

13   hear it.

14        And then the last phone call --

15        THE COURT:  No one can force you to perjure

16   yourself.  If a witness perjures themselves, it's because

17   of what they choose or how they choose to answer questions:

18   truthfully or not.  I mean, there's no -- there's no way

19   the Government is going to force you to perjure yourself.

20   I think that's an absurd contention.

21        THE DEFENDANT:  Maybe I phrased it wrong, but I

22   don't know, I -- just saying something wrong because I was

23   so -- he scared me.  Like he -- I was like, He scared me.

24   I was like hysterically crying when she called me back.  He

25   said he was going to rip up my deal and send me to jail for

1    a very long time.  So, I mean, I'm already going to jail

2    for a very long time, so I didn't know what to do.  I

3    didn't think they would do this the week of Thanksgiving,

4    the week before trial.

5            And then another prep question was:  Did we

6    promise you anything?  And I said yeah, 24 months and a

7    third off the sentence for like acceptance of

8    responsibility.  They were like, No, it just depends how

9    you are in trial.

10           And Mr. Fields already hates me, and said he was

11   going to rip up my deal.  So --

12           THE COURT:  But there's no representation in your

13   plea agreement that you were promised a -- first of all,

14   the Government can only recommend to me a sentence.  I'm

15   the one that decides the sentence.

16           Secondly, there's nothing in your plea agreement

17   that tells me -- independent of what you're telling me

18   right now, but nothing in the plea agreement that the

19   Government committed itself to recommending 24 months or

20   any recommendation.  So -- but the point -- so we can wrap

21   up this portion of your allocution, you're telling me that

22   the reason you didn't testify was you were so traumatized

23   by your phone calls with Mr. Fields and the other

24   prosecutors that that's why you didn't testify.

25           THE DEFENDANT:  So I had called -- so the

1    Wednesday before the trial, I had e-mailed my lawyer:  Did

2    we ever get the MOI about the new information I had given

3    them?

4           I didn't get a response from her because it was,

5    obviously, Thanksgiving and she was probably with her

6    family.  So I went ahead and got on a plane and came out

7    here and went to her office.  And all the concerns I had I

8    went over with her and there --

9           THE COURT:  Don't go into your discussions with

10   Ms. Butterton.

11          THE DEFENDANT:  Okay.

12          THE COURT:  Those are attorney-client privileged,

13   so --

14          THE DEFENDANT:  Sorry.

15          THE COURT:  Proceed, but don't discuss what you

16   and Ms. Butterton told each other.

17          THE DEFENDANT:  So, yes, so due to the overall --

18   everything and him already telling me he was going to rip

19   up my deal and send me to jail for a very long time, I was

20   scared if I deviate anything from the M- -- the original

21   statement, which he wasn't even a part of, that meeting,

22   they were going to rip up my deal anyway, because he stated

23   he was going to rip up my deal and send me to jail for a

24   very long time.

25          THE COURT:  All right.  All right.  That's your

1    explanation for why you didn't testify.

2           THE DEFENDANT:  Yes, sir.

3           THE COURT:  What else do you have to tell me?

4    What else do you want to tell me that you want me to take

5    into consideration from your view and from your perspective

6    as I consider the sentence I will impose?

7           THE DEFENDANT:  From -- okay, from my move

8    there -- okay, they're saying that I -- I did all this.

9    Yes, I had a part in it, but when I got in my discovery I

10   was shocked at amount.  Marcelle Green used to come to my

11   house to do all these things.  She was already doing this

12   with a boyfriend and she was introduced in this.  She even

13   went into my Accurint and was doing this information.  She

14   was even getting information to her house without my

15   knowledge -- all her addresses that she was using was

16   without my knowledge.  So the -- three, four, five times

17   the amount is because of Mrs. Green -- Ms. Green.

18          So yes, I went into my Accurint and I was giving

19   information, but not to that extent.  So, yes, I'm

20   responsible completely, but for the amount, I wasn't aware

21   that amount at all.

22          THE COURT:  All right.  You're telling me you

23   didn't receive, yourself, individually, personally,

24   $420,000?

25          THE DEFENDANT:  No.  And Mrs. Green obviously

1    was -- and I know this was in her -- in this trial in her

2    statements, she was transporting marijuana.  And somebody

3    also came to my home to threaten me before the trial not to

4    say anything about her involvement with transporting

5    marijuana.

6            THE COURT:  Well --

7            THE DEFENDANT:  So there -- there was just so

8    much.  And, yes, I had involvement in this and, yes, my job

9    was at home and I made a mistake by giving this information

10   to her, and I was influenced by doing this.  And, yes, I

11   did some homework, but I was not like this -- I worked from

12   9:00 a.m. to 8:00 p.m. everyday.  We had to have decisions

13   of auto loans within five minutes.  I was constantly on the

14   phone and on the computer.

15           I -- I don't have transcripts of what she actually

16   testified and I don't know if you have access to her MOIS,

17   but she said she was always over at my house doing -- this

18   is what she did all day.  So I just did not know the extent

19   of how much she had done.

20           So I -- I take full responsibility of what was

21   done because of my access to the database and what I

22   allowed -- who I allowed in my home and what I allowed to

23   come out of my work computer and my involvement in the

24   case.

25           THE COURT:  Anything else you want to say?

1          THE DEFENDANT:  And I understand that the people

2     have been hurt in the jail.  She had presented to me like

3     they wouldn't know and they wouldn't be hurt, but I

4     understand now, especially trying to rebuild life and

5     rebuild credit, especially knowing how hard it is to

6     rebuild credit, get stuff off.  Me, being a victim of

7     identity theft, myself, how many people I have to call and

8     submit papers and faxes of getting stuff off.

9          I know what I did was wrong and I'm going to

10    impact my kids forever, you know, because I've never been

11    without my kids and now the burden is going to be on my

12    oldest daughter to raise my kids and that's going to kill

13    me.

14          And I'm just so sorry and I'm so sorry if I

15    disrespected the Court in any way.  And, I mean, I'll live

16    with this forever.  I'm sorry.

17          THE COURT:  Did you think about all this before

18    and especially -- what I'm referring to is the effect it

19    would have on your children and particularly your two

20    youngest children, before you engaged in your crimes?

21          THE DEFENDANT:  My two youngest children weren't

22    born yet.  About -- and my two oldest, no.  At the time,

23    you know, my daughter was about to be 16 and she wanted,

24    you know, stuff 16-year-olds want and . . .

25          THE COURT:  All right.

1          THE DEFENDANT:  No.

2          THE COURT:  Anything else you want to -- I have

3    some questions for you, but before I ask you questions, I

4    want to make sure you're done with your allocution.

5          THE DEFENDANT:  Yes, sir, I'm done.

6          THE COURT:  You are?  Okay.  Can you point to me

7    any evidence, any text, e-mail, diary entry, that would

8    tend to show that had you not -- had your fraud not been

9    uncovered -- or discovered, that you would have voluntarily

10   stopped your criminal activity before the 26, or at least

11   not gone beyond the 26 months?

12         THE DEFENDANT:  I -- can I point to something

13   saying that I would have stopped?

14         THE COURT:  No, that you made some kind of record

15   that -- let me ask it this way:  Is there anything that you

16   could point to me that shows that during this 26 months,

17   you had any remorse for what you were doing and the effect

18   it was having on your victim such that you were considering

19   stopping your criminal activity before your fraud was

20   uncovered?

21         THE DEFENDANT:  Well, Trammel Thomas had moved

22   that year.  And after he had moved in, Marcelle Green was

23   not coming over as much.  And so I was actually trying to

24   sever our relationship with some other stuff that happened,

25   so without her in the picture it wouldn't have kept

1   happening.

2           THE COURT:  Well, according to the Government, you

3   stole the information -- personally identifying information

4   of 181 individuals from the Accurint database in the course

5   of discharging your duties as a bank officer.  You realize

6   that's what the Government's alleging.

7           THE DEFENDANT:  Yes, seeing the printout, yes.

8           THE COURT:  Do you deny that?

9           THE DEFENDANT:  No.  I saw the printout and it was

10   my log-in, so I --

11           THE COURT:  So as Ms. Paluch said, you heard her,

12   over 26 months, that averages seven times a month.  So 181

13   opportunities to say, you know, I'm going to stop here.

14   I'm going to stop at 93.  And I think what I'm doing is

15   wrong and I'm impacting the lives of these victims and I am

16   committing a felony, a federal crime, so I'm going to stop,

17   even though law enforcement hasn't discovered my scheme

18   yet.  Did you ever have those thoughts?

19           THE DEFENDANT:  I mean, I -- there's nothing I can

20   point out to prove to you --

21           THE COURT:  All right.  Just tell me -- just tell

22   me what you did or not.

23           THE DEFENDANT:  I didn't want to be involved in

24   it.  I wanted to start my own business and be completely

25   done with it.  I didn't like what I was doing and the

1   amount of -- it was just -- it felt like -- it obviously

2   felt wrong.  My whole life I've just been in the banking

3   industry.  I had a job, I had this, I never had to worry

4   about anything.  And being around Marcie and doing that,

5   it, of course, felt wrong, but she was over every day, so

6   it just kind of continued and it just got out of control

7   and there was -- I'm glad it happened to -- I know that

8   sounds weird, but I'm glad I got caught because I think I

9   need to go to prison because obviously I hurt people, I

10  took money that I didn't earn.  My kids need to see that,

11  you know, there's consequences for those actions.

12       I've always -- like I used to work double jobs.  I

13  mean, I have always busted my butt and so for them to know

14  that I just took money I didn't earn, just easy, and then

15  hurt people in the process, I need to go to prison.  I'm

16  not -- I'm not trying to say that I don't have remorse and

17  I don't think I should go, I absolutely think I should go

18  and I don't think it's right to keep doing it just -- she

19  was just over every day and she always, like, needed more,

20  and it was just kind of out of control.

21       I couldn't like -- I just had a hard time, like,

22  saying no.  It just kept going.  And she -- and she had no

23  job, so it was like she, you know, needed income.  She was

24  like my best friend, so I just wanted to help her.  And

25  then Mercedes didn't have a job and she was, you know, on

1    drugs and I was trying to get her off drugs and then do

2    like a business, and I just was trying to help people but I

3    really hurt people.  And now they're going to prison.  And

4    even though I don't like Marcie, like I don't -- she is

5    going to be away from her kids.  So like if I would have

6    never had that stupid job from home, she would have never

7    known like this -- it would have never happened.

8            THE COURT:  Well, you could have just told her no.

9    I mean --

10           THE DEFENDANT:  I know.

11           THE COURT:  -- I'm not going to engage in criminal

12   fraud.

13           THE DEFENDANT:  I absolutely agree with you.

14   You're completely right.  And now I'm here and I'm going to

15   be -- the consequence is the rest of my life.  Like I'm 40

16   years old, about to have a felony.

17           My son is three and has never said a word, ever.

18   Not "no," not "mama."  We go to speech therapy three times

19   a week, he has autism and now my 22-year-old has to -- I

20   just want -- the 22-year-old, she has to be a position of a

21   mom because of my greed, because of my friend's greed.

22   It's horrible.  Like I'm a horrible person.  And that's --

23   that's not that what -- this is just like completely

24   spiraled out of control.  It's just a horrible situation.

25   And I am sorry.

1          And I meant no disrespect to the Court.  I just
2     didn't want to get in any more trouble saying the wrong
3     thing on the stand.
4          And I absolutely think I should go to prison and I
5     think it's in God's hands, and whatever I'm supposed to
6     have happen in prison is supposed to show me -- and whoever
7     I'm supposed to meet there, I'm supposed to meet.
8          THE COURT:  All right, ma'am.  Are you done?
9          THE DEFENDANT:  Yes, sir.
10         THE COURT:  All right.
11         THE DEFENDANT:  I'm so sorry.  I'm crying like a
12    baby.  I -- in my head, this was not supposed to be crybaby
13    like this.  I'm so sorry.
14         THE COURT:  All right.  I'm prepared to rule on
15    the defendant's motion.  It is their initial contention the
16    defendant argues essentially there should be no adverse
17    consequences to her decision to not abide by her
18    cooperation agreement and testify at the trial of her
19    codefendant and former lover, Trammel Thomas.  I don't
20    think it would be a good use of my time here this afternoon
21    to recount the arguments and counterarguments from the
22    parties on this point.  It will suffice for me to summarize
23    my ruling on this particular point as follows:
24         I note that the Government has fulfilled all of
25    its obligations under the plea agreement.  It has moved to

1    dismiss all the remaining counts in the indictment, to

2    include the aggravated identity charges; it moved for the

3    defendant to receive all three points for acceptance of

4    responsibility; and it did not seek any further charges

5    against the defendant.

6          All of this is very significant because in my view

7    the defendant's failure to fulfill her obligations under

8    the plea agreement gave the Government the option, had it

9    chosen to exercise it, to withdraw from the plea agreement

10   and seek to reinstate all the charges from the original

11   indictment against Ms. Carr.  And, frankly, that is what I

12   had anticipated that the Government was going to do and why

13   I originally set a status conference in this case to take

14   up what I thought was coming down the pike.

15         Not only that, but even though the defendant

16   admitted to the forfeiture allegation in the indictment, no

17   order of forfeiture can now be issued on Count 1 and,

18   therefore, unlike her co-conspirator, Mr. Thomas, she will

19   not be subject to an order of forfeiture.

20         Finally, pursuant to the calculations set forth in

21   the plea agreement, the Government did not seek or advocate

22   for an abuse of trust enhancement for the two additional

23   levels for 10 or more victims as requested by the probation

24   officer.

25         In sum, I agree with the Government that Ms. Carr

1    received all the benefits of the plea agreement and at the

2    last possible moment she reneged on her obligation to

3    testify truthfully at Mr. Thomas' jury trial.  And that by

4    doing so, she inflicted the maximum amount of potential

5    harm to the Government's case against Mr. Thomas.  I find

6    that it is appropriate for me to consider the defendant's

7    conduct in breaching her cooperation in fashioning a just

8    sentence to impose upon her.  And I'm referring for support

9    for this position to the Seventh Circuit decision Ms.

10   Paluch referenced, *United States v. Turner*, 864 F.2d 1394

11   at 1399, a 1989 decision from that court.

12          The Tenth Circuit -- the Seventh, rather, the

13   Seventh Circuit in that court held that reneging on one's

14   promise is a basis of punishment independent of the

15   assertion of the privilege not to testify and is a basis on

16   which the sentence legitimately may be augmented.  Apart

17   from her arguments related to her failure to testify at the

18   trial of her codefendant, the defendant's motion and her

19   requested 24-month variant sentence rests primarily on

20   three grounds.

21          First, for someone who has never been in prison

22   before, a 24-month custodial sentence is more than enough

23   time to reflect the seriousness of her offense, provide

24   adequate deterrence, and protect the public from future

25   crimes.

1          Her second major argument is that her children

2    and, especially her two youngest children, need her at home

3    and will be very adversely affected by a prolonged absence

4    on her part.

5          And, lastly, that this being her first felony

6    conviction, it places her in a Criminal History Category of

7    I, which according to the Sentencing Commission data,

8    individuals in that category have a recidivism rate of

9    only, I'll use the word "only" of 14 percent and that that

10   is another mitigating factor.

11         So let me first take up grounds 1 and 2.  The

12   first argument essentially that because she has no prior

13   period of imprisonment, any period behind bars will have a

14   profound deterrent effect especially as compared to

15   defendants with several prior felony convictions and

16   periods of incarceration.  I have previously categorically

17   rejected this line of reasoning, especially in cases of

18   so-called white-collar financial crimes prosecutions like

19   the one before me today.  Taken to its extreme, the

20   argument would countenance very light sentences to

21   sentences like Bernie Madoff, who engaged in egregious and

22   protracted fraud and caused vast human and financial

23   damages merely because they were first-time offenders.

24         The defendant's related argument that as an

25   experienced bank employee, the mere fact of this conviction

1    will preclude her from working in the financial services

2    industry ever again, and by virtue of that she will never

3    again be able to use the banking experience and skills she

4    has developed over many years, these are all additional

5    burdens and losses Ms. Carr will already suffer, and as a

6    result this argues for a lower custodial sentence,

7    according to the defendant, in this case.

8           I categorically reject this argument as well.  I

9    note that the circuit courts have swiftly disposed of these

10   arguments for the very same reasons I find they have little

11   to no merit in these circumstances.  Let me quote from just

12   two appellate decisions which very clearly crystallize, in

13   my view, these issues and articulate why we as federal

14   judges must not apply one set of sentencing factors to

15   white-collar fraud defendants and a different set to the

16   so-called drug and gun class of defendants.  *United States*

17   *v. Musgrave*, 761 F.3d 602 at 604, a 2014 decision from the

18   Sixth Circuit.  The Court there considered the drastically

19   reduced sentence I just recorded imposed in the bank and

20   wire fraud case where the guideline sentencing range, like

21   it is here, was 57 to 71 months.  The Sixth Circuit stated,

22   quote, The District Court relied heavily on the fact that

23   Musgrave had already been punished extraordinarily by four

24   years of legal proceedings, legal fees, the likely loss of

25   his CPA license, and a felony conviction that will follow

 1   him for the rest of his life, end quote.

 2          The Sixth Circuit determined that the consequences

 3   of Musgrave's prosecution and conviction were impermissible

 4   factors to be considered.  The Court went on, quote, None

 5   of these things are his sentence nor are they consequences

 6   of his sentence.  A diminished sentence based on these

 7   considerations does not reflect the seriousness of his

 8   offense or effect a just punishment, end quote.

 9          In a similar vein, the Seventh Circuit has even

10   more aptly stated as follows, quote, No middle class

11   sentencing discounts are authorized.  Business criminals

12   are not to be treated more leniently than members of the

13   so-called criminal class just by virtue of being regularly

14   employed or otherwise productively engaged members --

15   individuals in lawful economic activity.  It is natural for

16   judges, drawn as we are from the middle or upper middle

17   classes, to sympathize with criminals drawn from the same

18   classes, but in this instance, we must fight our nature.

19   Criminals who have the education and training that enables

20   people to make a decent living without resorting to crime

21   are more, rather than less, culpable than their desperately

22   poor and deprived brethren in crime.

23          That's from the United States -- case of *United*

24   *States v. Stefonek*, S-t-e-f-o-n-e-k, 179 F.3d 1030 at 1038,

25   a Seventh Circuit decision from 1999.

1          So I will not be varying downward in this case

2     because Ms. Carr is an experienced bank and financially --

3     financial industries employee who has never served time

4     behind bars before.

5          The second argument with respect to the

6     defendant's two young children:  In her motion the

7     defendant also argues that I should impose the dramatically

8     reduced sentence she seeks for the separate reason that her

9     two youngest children, ages 7 and 3, will be strongly and

10    adversely affected by her prolonged absence were she to be

11    sentenced within the guideline sentencing range.

12         This is an argument I hear not infrequently from

13    defendant parents, both mothers and fathers, with young

14    children in the house -- in the home.  I reject this as a

15    separate grounds for granting the motion.  My response to

16    this argument is a very simple one:  Ms. Carr should have

17    paused to consider the effect on her two young children of

18    her possible incarceration before she embarked on her

19    course of criminal conduct and not just afterwards.

20         This is -- this was a -- as Ms. Paluch pointed

21    out, and since this was not just a one-time crime like a

22    single bank robbery, but instead it's a sustained series of

23    criminal actions and fraudulent conduct undertaken 181

24    times and repeatedly over the course of 26 months, that if

25    Ms. Carr's maternal instincts had truly triggered authentic

1    concern for the future welfare of her children, Ms. Carr

2    had ample and multiple opportunities during her protracted

3    crime spree to bring her crimes to a swift end; but she did

4    not.

5        I am not unsympathetic that during -- that two

6    young children in this case will be without their mother

7    for a period of years.  At least in this case, they will

8    apparently be well taken care of by Ms. Carr's adult

9    daughter and son-in-law.

10       The last factor in aggravation I wish to discuss

11   are the victims in this case.  As I discussed earlier in

12   this context, these incarcerated victims are considered a

13   vulnerable group under the Sentencing Commission

14   Guidelines, and for good reason.  My review of their victim

15   letters has convinced me that the harm the defendant's

16   crimes has inflicted upon them is real and significant.

17       I read about the previous damages done to these

18   individuals' credit history and how some of their files

19   have been red flagged and worse, and that such -- and the

20   odds that they will be facing when they are released to

21   obtain credit or loans or educational or housing -- for

22   educational or housing purposes or for trying to get a job,

23   and that all those opportunities have now been

24   significantly diminished.

25       For a societal group which already faces severe

1   impediments to transitioning to law-abiding lives with

2   gainful employment, this added personal damage done to them

3   is, in my view, especially cruel.

4          So in conclusion, I find the defendant has failed

5   to convince me that the statutory services are best served

6   by granting her variance motion.  I specifically find that

7   the variant sentence sought by the defendant in her motion

8   fails to reflect the seriousness of the offense, fails to

9   afford adequate deterrence to future criminal conduct and

10   will, in fact, not protect the public from further crimes

11   of this defendant.  As a consequence the defendant's motion

12   for variant sentence is denied.

13          I do, however, agree with the defendant's final

14   argument in her motion, premised on the fact that this is

15   her first felony conviction and that she has no substantial

16   criminal history and that those are legitimate factors in

17   mitigation.

18          Also in mitigation I think are the very heartfelt

19   and genuine letters of support from her family that I

20   received and read.  And it is for these reasons that I

21   intend to sentence the defendant at the bottom of the

22   guideline range instead of the middle range or higher.

23          Given all the above, I intend to sentence the

24   defendant to a period of incarceration of 57 months to be

25   followed by a term of supervised release of three years.  I

1    also intend to order that Ms. Carr pay restitution in the

2    total amount of $562,487.85, in addition to the special

3    assessment of $100.  Imposing a fine in this case would, in

4    my view, impair Ms. Carr's ability to simultaneously pay

5    restitution.  For this reason, I intend to waive payment of

6    any fine apart from the special assessment as well as any

7    interest on the restitution amount.

8          Before I actually impose sentence, I'll give

9    counsel a final opportunity to make any record they believe

10   appropriate.  Ms. Paluch.

11         MS. PALUCH:  None, Your Honor.  Thank you.

12         THE COURT:  Ms. Butterton.

13         MS. BUTTERTON:  Your Honor, just a couple of, I

14   suppose, housekeeping matters.  First, we are seeking

15   recommendation to a facility in Arizona so Ms. Carr can be

16   close to her family.  I believe there was an FCI in

17   Phoenix; of course that's up to the Bureau of Prisons.

18         THE COURT:  Is there one -- is Arizona as lucky as

19   we are to just have one federal district?

20         MS. BUTTERTON:  I'm embarrassed that I don't know

21   the answer to that question.

22         THE COURT:  I need to recommend to a federal

23   district, not to a state.  Let me ask Mr. Gill.

24         MS. BUTTERTON:  I think it's one district because

25   of the population --

1              PROBATION OFFICER:  Your Honor, there is one

2      district of Arizona.

3              THE COURT:  There is just one district of Arizona.

4      Is there any objection from the Government?

5              MS. PALUCH:  No, Your Honor.

6              THE COURT:  Does this facility, to your knowledge,

7      Ms. Butterton -- I hope you looked into this -- house

8      female inmates?

9              MS. BUTTERTON:  That's correct, Your Honor,

10     there's a female facility.  And I don't believe that Ms.

11     Carr's going to be anything above the lowest security

12     designation.

13             THE COURT:  Okay.  So I think you've been to

14     enough sentencings in front of me to know that I don't

15     recommend to a particular facility, just that a facility

16     within a particular district that's appropriate to the

17     security designation of the defendant.

18             MS. BUTTERTON:  That's fine, Your Honor.  Thank

19     you.

20             THE COURT:  Given that there's no objection from

21     the Government, I will include that in the judgment.

22             MS. BUTTERTON:  The only other housekeeping matter

23     which the Court may want to address later is the issue of

24     surrender.

25             THE COURT:  Yeah.  We'll deal with that later.

1           All right.  I find no reason to depart from the

2     guideline sentencing range as calculated by the

3     Government's motion -- let me see -- I -- I find no reason

4     to depart from the guideline sentencing range which does

5     not exceed 24 months and I will impose a sentence within

6     that range.  I find that the sentence I will impose in this

7     case reflects the seriousness of the offense, affords

8     adequate deterrence to future criminal conduct, and will

9     protect the public from further crimes of this defendant.

10          Accordingly pursuant to the Sentencing Reform Act

11    of 1984, it is the judgment of this Court that the

12    defendant, Heather Carr, be committed to the custody of the

13    Bureau of Prisons to be imprisoned for a term of 57 months.

14    The Court recommends that the defendant be incarcerated at

15    a facility appropriate to her security designation located

16    within the district of Arizona.

17          Upon release from imprisonment, the defendant

18    shall be placed on supervised release for a term of three

19    years.  While on supervised release, the defendant shall

20    not commit another federal, state or local crime; shall not

21    possess a firearm as defined in 18 United States Code

22    Section 921; and shall comply with the standard conditions

23    that have been adopted by this Court in District of

24    Colorado General Order 2016-1.

25          The defendant shall not unlawfully possess and she

1    shall refrain from unlawfully using a controlled substance.

2    The Court waives the mandatory drug testing provisions of

3    Section 3563(a)(5) because the report indicates a low risk

4    of future substance abuse by this defendant.

5          The defendant shall cooperate in the collection of

6    DNA as directed by the probation officer.

7          The Court finds that the following special

8    conditions of supervision are reasonably related to the

9    factors enumerated in Sections 3553(a) and 3583(d), and

10   they do not constitute a greater deprivation of liberty

11   than reasonably necessary to accomplish the goals of

12   sentencing.

13         Special condition No. 1, the defendant shall not

14   incur new credit charges or open initial lines of credit

15   without the approval of the probation officer unless the

16   defendant is in compliance with the periodic payment

17   obligations imposed pursuant to the Court's judgment and

18   sentence.

19         No. 2, as directed by the probation officer, the

20   defendant shall apply any monies received from income tax

21   refunds, lottery winnings, inheritances, judgments, and any

22   anticipated or unexpected financial gains to the

23   outstanding court-ordered financial obligation in this

24   case.

25         No. 3, the defendant must provide the probation

1   officer access to any requested financial information and

2   authorize the release of any financial information until

3   all financial obligations imposed by the Court are paid in

4   full.

5          No. 4, if the defendant has an outstanding

6   financial obligation, the probation office may share any

7   financial or employment documentation relevant to the

8   defendant with the Asset Recovery Division of the United

9   States Attorney's Office to assist in the collection of the

10  obligation.

11         No. 5, the defendant shall document all income or

12  compensation generated or received from any source and

13  provide such information to the probation officer as

14  requested.

15         No. 6, the defendant shall not cause or induce

16  anyone to conduct any financial transaction on her behalf

17  or maintain funds on her behalf.

18         No. 7, the defendant may not engage in any

19  occupation, business, profession, or volunteer activity

20  that would require, enable, the defendant to obtain

21  personally identifying information of customers or other

22  employees without prior approval of the probation officer.

23         No. 8, the defendant shall not engage in any

24  business activity unless that activity is approved by the

25  probation officer.  Any approved business activity must

1    operate under a formal registered entity for all -- for any

2    approved business activity.  The defendant shall provide

3    the probation officer with the names of all business

4    entities and their registered agents.  The defendant shall

5    not register any new business entity, foreign or domestic,

6    without the approval of the probation officer.  The

7    defendant shall not cause or induce others to register

8    business entities on her behalf.

9         For any approved business activity, the defendant

10   shall maintain business records.  The defendant shall

11   provide all requested documentation and records to the

12   probation officer regarding any of her business activities

13   as requested by the probation officer.

14        No. 9, the defendant shall maintain separate

15   personal and business finances and shall not commingle

16   personal and business funds or income in any financial

17   accounts including, but not limited to, bank accounts and

18   lines of credit.

19        No. 10, the defendant shall submit her person,

20   property, house, residence, vehicle, papers, and computers,

21   as defined in 18 United States Code Section 1030(e)(1),

22   other electronic communications or data storage devices or

23   media or office to a search conducted by the United States

24   probation officer.  Failure to submit to such search may be

25   grounds for revocation of supervised release.

1          The defendant shall warn any other occupants that

2     the premises may be subject to searches pursuant to this

3     condition.  An officer may conduct this search pursuant to

4     this condition only when reasonable suspicion exists that

5     the defendant has violated a condition of supervision and

6     that the areas to be searched contain evidence of this

7     violation.  Any search must be conducted at a reasonable

8     time and in a reasonable manner.

9          The defendant is ordered to make restitution in

10     the total of $562,487.85 in the amount and to the

11     individual victims as set forth in the table found at

12     paragraph 93 of the final report, ECF 250.

13          The defendant shall pay a special assessment of $100,

14     which shall be due and payable immediately.

15          The Court finds that the defendant does not have the

16     ability to pay a fine in light of the restitution

17     obligation imposed by the judgment; the Court therefore

18     waives payment of any fine other than the special

19     assessment, and for this reason payment of interest on the

20     restitution amount is also waived.

21          The special assessment and restitution obligations

22     are due immediately.  Any unpaid restitution balance, upon

23     release from incarceration, shall be paid in monthly

24     installment payments during the term of supervised release

25     of not less than 10 percent of the defendant's gross

1     household monthly income.

2              Within 15 days of release from custody, the

3     defendant shall meet with the probation officer to develop

4     a plan for the payment of an unpaid portion of his

5     obligations under the court's judgment -- of her financial

6     obligations under the court's judgment.  This plan will be

7     based on the defendant's income and expenses.  The plan

8     will be forwarded to the Court for review and approval.

9              All right.  Let me take up now the issue of

10    voluntary surrender.  Ms. Butterton, it's the defendant's

11    burden, so I'll let you go first.

12             MS. BUTTERTON:  Your Honor, the factors at play --

13    the statutory factors at play here are the same as after

14    the change of plea:  Whether she is a risk of flight,

15    danger to the community.  These all come into play.  Again

16    it's the same standard as the change of plea.  The

17    Government did not seek it then.

18             I can't respond to whether they're seeking it now,

19    but Ms. Carr has been on bond for almost a year, has had no

20    violations, has talked to the probation officer, and would

21    request the time to get her affairs in order.

22             THE COURT:  Okay.  Does the Government have any

23    objection to voluntary surrender?

24             MS. PALUCH:  We do not, Your Honor.

25             THE COURT:  I find by clear and convincing

1   evidence that the defendant is not likely to flee, nor does

2   she pose a danger to the safety of any other person or the

3   community.

4        It is therefore ordered that the defendant,

5   Heather Carr, surrender at the institution designated by

6   the Bureau of Prisons on February 8th, 2018, at 12:00 noon.

7   In the interim, the defendant's bond is continued and all

8   conditions set forth in the magistrate judge's order

9   setting conditions of release shall continue to apply.

10        Ms. Carr, I'm giving you five weeks from today to

11   get your affairs in order before you report to the Bureau

12   of Prisons.  Let me point out to you, ma'am, that if you

13   fail to report to the Bureau of Prisons on the 8th of

14   February to begin to serve your sentence, that such a

15   failure to report will, itself, be a new and separate

16   criminal offense.  Are we clear on that?

17        THE DEFENDANT:  Yes, sir.

18        THE COURT:  All right.  And, lastly, Ms. Carr,

19   pursuant to the plea agreement you entered into in this

20   case, you waive the right to appeal your conviction as well

21   as the sentence I just imposed except in very limited

22   circumstances.  Given that I did not impose upon you a

23   custodial sentence which exceeds the statutory maximum, or

24   is greater than that applicable to an offense level of 23,

25   it would appear that your right to appeal under your plea

64

1    agreement is nonexistent unless the Government chooses to

2    file an appeal.

3            In any event, to the extent you retain the right

4    to file an appeal, I'm advising you that should you wish to

5    file such an appeal, a notice of appeal must be filed with

6    the Clerk of the Court within 14 days after entry of

7    judgment or the right to appeal will be lost.

8            If you're unable to afford an attorney for an

9    appeal, the Court will appoint one to represent you.  If

10   you're unable to afford the fees for filing an appeal, you

11   may file a request with the Court that such fees be waived.

12           All right.  Is there anything further from the

13   Government at this time?

14           MS. PALUCH:  No, Your Honor.  Thank you.

15           THE COURT:  All right.  Anything further from the

16   defendant?

17           MS. BUTTERTON:  Just one moment, Your Honor.  I

18   just -- I believe -- no.  Nothing else.  Thank you.

19           THE COURT:  All right.  Anything further from the

20   probation officer?

21           PROBATION OFFICER:  No, sir, Your Honor.

22           THE COURT:  All right.  All right.  Thank you,

23   that will be all.

24           (Proceedings concluded at 3:27 p.m.)

25

1                  *       *       *       *       *

2                       REPORTER'S CERTIFICATE

3

4        I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled

6   matter.

7        Dated at Denver, Colorado, this 12th day of February,

8   2018.

9

10

11

12       _                                            _

13                   MARY J. GEORGE, FCRR, CRR, RMR

14

15

16

17

18

19

20

21

22

23

24

25